And before we get started, Mr. Gilmour, thank you for stepping up. Appreciate it. Good morning. May it please the Court, Peter Morrison on behalf of the appellants, I'd like to reserve three minutes for rebuttal, Your Honors. Thank you. The District Court wrongly applied a loss causation standard to assess whether defendants demonstrated a lack of price impact sufficient to rebut the presumption of reliance. That was error. The Supreme Court has explained in Halliburton 1 that loss causation is a, quote, distinct concept in securities laws. It is not price impact. The Second Circuit has addressed the issue and explained that the standard for price impact is different than the standard for loss causation, explaining that the Supreme Court's decision in Goldman, quote, unquote, a closer fit for price impact than is required for loss causation. This makes complete sense, Your Honors. This is a very specific type of securities case. It's a price maintenance case or an inflation maintenance case. In this case, the plaintiff doesn't argue that the stock price rose based on a misstatement. The stock price stayed the same. And the plaintiff is arguing that the misstatement prevented the stock on the front end from declining. Well, in that instance, it's really difficult to determine whether there's been price impact because the stock didn't move. If it had risen, we could fight about whether or not there was price impact. Here, it didn't. So what the plaintiff does, goes forward in time, finds a back-end disclosure and a price drop, and then argues that that back-end disclosure, the back-end drop, is a proxy for the front-end price maintenance. Well, isn't that a permissible theory if there's a match between the alleged false statement and the corrective statement? Yes, Your Honor. That's exactly where I'm going. There's nothing wrong with the concept in the abstract. We have not taken the position that inflation maintenance is impermissible, per se. But, Your Honor, even though we haven't challenged the inflation maintenance, the theory is inherently tenuous. To your point, it only works if the so-called later back-end disclosures are a close fit to the earlier so-called front-end disclosures by revealing what the front-end disclosures supposedly concealed. Without that close connection, there's no basis to accept an inference that the back-end drop should serve as a proxy to tell the court how the stock would have reacted on the front-end had the statements been what the plaintiffs say they should have been. Rather than apply Goldman's mismatch standard here, Your Honors, the district court applied a far broader loss causation, collapsing loss causation and reliance. Well, what was the back-end disclosure here, in your view? How would you describe it? So the back-end disclosure that they talk about is the revelation, in their words, the revelation that Zillow couldn't get its pricing right in its eye-buying business. Well, that seems to me to be a fit because at the beginning, Zillow bragged about the wonderful algorithm, I guess is the right word. We have this fabulous algorithm that's going to tell us precisely what the value is, and we are bragging about our ability to renovate, and those turned out to be false, or at least that's the allegation, because there was this so-called overlay where the algorithm didn't work all by itself and the renovations didn't work because they stopped using the contractors. So I'm not really sure why you think there's a mismatch Well, before we even get to mismatch, we know that the district court below applied a loss causation standard. That can't stand after Halliburton and Goldman, two Supreme Court authorities. So that case has to be vacated. I don't understand that. Yeah, I don't understand that argument either, because I mean, you seem to be making a fine-tuned distinction, and maybe they're different theories, but they seem to be aimed at the same issue. They're really not, Your Honor, and I really want to address that. Maybe I'll address Judge Graber's question and then come back to your question, Your Honor. So why is it not a match, putting aside the different legal standard and assuming that the court had actually applied a mismatch standard? First, their theory is not that Zillow misrepresented its pricing problems on the front end. On August 5th and September 13th, nobody disagreed, and they're not challenging, that Zillow raised its pricing to buy more homes. Nobody disagreed or is challenging that Zillow in fact scaled and bought more homes because it raised the price. But I thought they were claiming that the algorithm, that Zillow was saying our algorithm is working, and they were secretly, is the allegation, having human hands come in and like readjust this. Right. So what they're arguing is not that the price wasn't increased, but it's how was the price increased. Right. But how the price was increased was the gross price overlay. What was omitted was not that we were having pricing problems. It was we didn't disclose how we were doing it. We didn't disclose the gross price overlay itself. It was that you were misrepresenting how you were doing it. That was the allegation. I mean, that's the allegation. Whether it stands or not, I don't know. But the allegation is your Zillow's out here claiming we have this algorithm. It works. And yet, I mean, I was thinking of the Theranos example. Sorry. I sat on that case where, you know, they're like, oh, we were doing the blood. We're doing the blood draw. Well, there's a big difference between whether it's Theranos' blood draw or whether, as facts suggested, they were out there using other people's machines to do it. That was held to be a misrepresentation. And that seems to be somewhat analogous here. Again, I'll make two points. I disagree strongly that their case is at a broad level. We said we got pricing right. And then on the back end, we didn't get pricing right. We told the market that this is a very difficult pricing environment. As early as February of that year, in our 10K, we said this is a new business. Pricing is really hard. It may be inaccurate. We don't know. On August 5th, in the very earnings call that they are focused on, the CEO was asked, what's the biggest challenge? And he said pricing. We have to get better and better at pricing. This is really, really hard. Fast forward. Their corrective disclosure date from the back end, where they say you revealed pricing was a problem, was October 17th, 18th, 31st, 1st, and 2nd. As early as October 4th, RBC puts out an analyst report that says Zillow is getting its pricing wrong. It looks at publicly available information and says it's getting its pricing wrong. The market knew as of October 4th that Zillow was not getting its pricing right. If we're in an efficient market... My point is the manner in which they were getting the pricing wrong doesn't matter. So it matters for purposes of mismatch, but for purposes of whether this can impact the stock, if you take them at their word that the back end drop was caused by the, we think it's a repeat of information, but the revelation that we couldn't get pricing right, that information was in the marketplace long before the corrective disclosures. If it's an efficient market and they need that to rely on this presumption of reliance, the repeat of information that's already in the market can't possibly be what's impacting and driving the stock price. All of the disclosure dates, and it's in the record, where analysts are looking at publicly available data. You can go on Zillow's website and pull it down. They all looked at it and they said Zillow's not getting its quarter. It's going to be dealing with inventory into the fourth quarter. And RBC on October 4th says this is readily understood in the market. The stock price on that day didn't drop. It didn't move. And then there's no fewer than eight... What did it cost the stock price to drop? Two things. And our expert says this. One, in the middle of August, we paused home buying. That's new information. That couldn't be what drove the stock price because nobody knew as of August and September, the dates of the misstatements, that we would have paused home buying in the middle of October. That's new news. The stock price dropped because it was bad news. Then fast forward to the beginning of November, we shut down an entire business line. Of course the stock price moved in response to that. And they don't say that the pause and the closing of the business revealed the fraud. They say the revelation of the fraud was we couldn't get pricing right. Everybody knew we weren't getting pricing right by that time. And that's the point we made. How can they show price impact by repeating information that's been in the market seven or eight times that we know didn't move the stock? They can't say the market's efficient for purposes of their presumption when it's good for them and then say, oh, but it's not efficient and don't look at that stuff when it's bad for them. And let me give you one example, Your Honor, of that because I know that the court's concerned about it because I think it's apropos. But can I just ask you, because like some of the allegations that, well, some of the statements that were made that I think are included in the complaint, this is from Waxman and he sat with an interview. This is the September 2021 statement. Some unit economic improvements are durable, including on more dynamic renovation will be passed back on to the customer and eventually to the bottom line. I guess I read that, or at least the plaintiffs are suggesting, that means unit economic improvements are durable sort of suggests that we're coming up with a system that's going to work on this, that's going to make this work. Right. But again, those two positions are not mutually exclusive at all. You can say on the front end that we are reducing pricing, which they're not arguing that historically we had reduced costs. Second, and relatedly, what the language is, we are making progress on pricing modeling. We are improving our pricing modeling. So are you saved on that because it says some? Yeah, it says... Would that be false if you had said, well, our unit economic improvements are durable? I mean, is that... No. Does that mean when it says unit economic improvements are durable, does that mean we're using an algorithm? No, your honor, that goes to their argument that somehow Zillow contractors were refusing Zillow jobs. That says nothing about what contractors were doing. They're saying that durable is false because at some point in their view, we reduce the scope of renovation projects to reduce costs and Zillow contractors refuse jobs. How can... The back end doesn't reveal that at all, right? And that's a complete mismatch. And just to... So let me come back to your sort of larger question about why is loss causation and price impact different? And this is really critical because if the court allows a loss causation standard to stand, to look at a mismatch, you could seriously expand security's liability beyond where it already is. First, so let me try it this way. Didn't Goldman... Well, I want to hear you, but the question in the back of my mind is, didn't the Supreme Court and Goldman already sort this? They looked at some of these loss causation cases. Okay, go ahead. No, the Supreme Court did not look at loss causation cases at all. The Supreme Court... What the Supreme Court said, your honor, and I really want to get back to explaining the distinction, but the Supreme Court said, it said that in inflation maintenance cases, defendants may rebut the basic presumption by showing, quote, a mismatch between the contents of the misrepresentation and the corrective disclosures, and that the final inference that the back-end drop equals front-end inflation starts to break down where there was a mismatch between the contents of the misrepresentation and the corrective disclosure. And the reason is that if there's a mismatch, there's less reason to infer, to use the language of the court, front-end price inflation, that is price impact from back-end drop. So what Goldman is saying is there's got to be a close fit. That's what the Second Circuit says. And the Second Circuit specifically says that this close fit analysis is not a loss causation analysis. And now let me explain why. So if you were to let the district court case stand, it would create a circuit split between the Ninth Circuit and the Second Circuit. Counsel, what do you make of the Supreme Court's statement in Goldman Sachs that on remand, the Second Circuit must take into account all record evidence relevant to price impact, regardless of whether the evidence overlaps with materiality or any other merits issue? Basically, I read Goldman Sachs to say nothing more than look at everything and use your common sense and see if it makes sense to find a match or not. I don't see them as saying you can't consider things that might affect the merits. That's the difference, Your Honor, between an evidentiary question and a legal standard. As far as evidence goes, we are on the same page. The merits evidence can be considered, whether it overlaps with loss causation, materiality, what have you. Evidence should all be considered. That's actually one of our errors that we've argued below, which is the court specifically said it wasn't considering some of our evidence because it, quote-unquote, went to the merits. That's another error the court made. In terms of evidence, okay, but the legal standard that needs to be met by looking at all that evidence is vastly different between price impact and loss causation. Loss causation is like out-of-tort law. It's a proximate cause. It can be shown in all sorts of different ways. In looking at Ninth Circuit precedent, the misstatement can be a substantial factor in the loss. Number two, the loss can be foreseeable from the front-end statement. In Mineworkers, which the court below wrongly cited, it says that the back-end drop can be a mere consequence of a risk that was hidden on the front-end. Very broad, lots of different ways to satisfy that standard. Price impact, and so basically it's did A cause B. Price impact under Goldman isn't about whether A caused B. It's not a proximate cause issue. It's whether the drop after B equals A because we want to look at whether the drop on the back-end can serve as a proxy for price inflation on the front-end where the price on the front-end didn't move. What we're trying to figure out is what would have happened here on the front-end had these statements been what plaintiffs claim they should have been. The only way you can accept a back-end front-end inference is if the back-end reveals the falsity of the front-end or reveals the omitted facts, and the facts that they say were omitted is Grice Price overlays and that contractors were refusing jobs. That's exactly what was not revealed on the back-end, and therefore there's no basis to make this assumption that the back-end drop that we say is caused by the shuttering of a business line should be fast-forwarded to say this is what would happen on the front-end. We don't know under these circumstances. And just very briefly, I think I'm... You're over, but I'll finish this point and I'll give you two minutes for rebuttal. Thank you very much. And just to get to the district court case for a second, when setting up the standard, the court doesn't actually apply a mismatch test. The court looks at three Ninth Circuit loss causation cases, two of which are motion-to-dismiss cases. That can't be right. It can't be that if you plead loss causation, a defendant can never show a lack of price impact. The presumption of reliance would become a rule. And the last point, really quickly, what the court quoting Mineworker says, an event can be corrective when it merely discloses a consequence of concealed information. For example, an earnings miss, even if the connection between the cause and the consequence is not made explicitly in the disclosure. What the court below is saying is, even if there's a mismatch, you can have price impact by applying Mineworkers. And then when it applies it, and I'll give you one example, then I'll sit down. Thank you for your indulgence. When it applies it, it says, because October 31 Key Bank Report and the November 1 Bloomberg article disclose the consequences of using the language of Mineworkers loss causation case, Zillow's alleged misrepresentations, they are corrective disclosures capable of having a price impact. That's the wrong question. Whether the back-end disclosures are capable of having a price impact isn't the question. That's a causation question. The question is whether the front-end misrepresentations could have a price impact. That's exactly the analysis he's not doing here. And so we think at a minimum, this case, the decision should be vacated so that way a loss causation standard isn't bound up with this price impact analysis. And at a minimum, it should be remanded. Thank you for the time. We'll go ahead in two minutes for a vote. Good morning. May it please the court, Lucas Gilmore on behalf of the plaintiff and the putative class. Before addressing the arguments, I think just immediately up front that Zillow has fundamentally taken up the wrong case on appeal under the Goldman mismatch issue. None of the concerns animating the Supreme Court in Goldman are present here. In Goldman, it holds that the court should conduct a searching price inquiry analysis where there's three issues that are present. A generic front-end misstatement, a considerable gap in specificity and subject matter of the corrective disclosure, and where the corrective disclosure doesn't refer at all to the front-end generic misstatement. Can you help flesh this out? Because I want to clarify my understanding of what the statements were. What was the statement that, I guess, came up in October 31st that was not already public? So two categories of misstatements. The first have to do with claims of improved pricing models and record purchases. So Zillow claimed in August that it doubled acquisitions, which reflected the progress of strengthening its price models. Senior officers repeated were, quote, back on track, improved pricing models, sharpened offer strength, record purchases. And they claimed confidence in the ability to scale this resulting from the progress it made and strengthening its pricing models. Okay. But that only references pricing models. I guess I thought that the distinction was the difference between algorithms and manual manipulation because they found out their algorithms weren't working correctly, so they kind of come in and like... Yeah. I think they're one in the same, the pricing models. Why are they one in the same? Because, yeah, the pricing model, I mean, they didn't actually represent how the pricing model was conducted. They just said it's a better pricing model. They might've been right, they might've been wrong, but they were making improvements that they thought... I mean, is your concern that, or your claim that they didn't disclose how those pricing models were done earlier and then they... Now that I'm thinking about it, there's no information later on how the pricing models were actually done. Is there a mismatch there? No, your honor. The pricing model, they're an eye buying. They make their purchases based on their algorithmic pricing models. They express confidence in their ability to price out the In reality, there was a code read due to their inability to properly predict pricing. That's a paragraph 91 of the complaint. And then they secretly launched a project catch up to apply management determined overlays, where the overlays increased offers by 5% to 7% above the algorithmic valuations, despite warnings of overpaying. That's false misleading. And at the front end, there's concern... What about that was not public? About the... About the pricing model. Because they, I mean, Zillow's here saying, well, wait, everybody knew it was hard to price these. We weren't saying we're getting this perfect, but we were saying we were developing this. I thought there was a misrepresentation in how the models were being done. But now I'm starting to question, that doesn't seem to be what you're arguing. Your honor, what we're saying is they're making... What you're saying is when you said your pricing models were getting better, they weren't. Well, yes. And in particular, it's misleading to fail to disclose that you're making manual overlays. Why? Why is that misleading? Well, because they know at the time that they're overpaying and it creates a significant risk. Okay. Well, those are two different issues. I don't view them, and the court didn't view them as two different issues. When you affirmatively tout the model, your buying prowess, and you fail to disclose information that you're moving away from the pricing model itself and making manual overlays, that's false and misleading. That's not the definition of the pricing model. Did they define the pricing model as only algorithm and no manual overlay? Your honor, that's what was understood by the market was they were using their algorithmic method. And that's the material that starts at paragraph 70 of your complaint that talks about how they advertise and they market the Wall Street Journal and all these other folks understand it to mean the Zestimate that comes out of a computer. That's right. And that's core to their business. That's what their business model is. That's what separates them from competitors who operate in this space that don't use the algorithm. Now, this was value-relevant information. Analysts, the most sophisticated investors, investment banks, repeated and referred to the misstatements in their reports to investors. So when was it made public that there were manual overlays to the Zestimate algorithm? Well, we allege that the truth was eventually disclosed over three partially corrective disclosures, ultimately revealed to the market on November 2nd when they closed Zillow offers. It begins on October 17th through 18th when they announced a pause in purchases. Bloomberg reported that... But the pause in purchases doesn't address the pricing model. It does because they blamed it on operational backlog for renovations and closing. And that partially revealed the consequence of the fraud that they had not improved their acquisition. They had over-acquired and they had not made operational cost savings. And in fact, there was a renovational backlog. What I'm not hearing in what you just said is any reliance on the Zestimate versus manual overlay. I'm probably missing something, but... Well, that's not typically how securities frauds work. You're not going to have a corporate issuer admit to a fraud. You have partial disclosures and here... But what about that partial disclosure? I mean, part of the problem is you need to have your theory of pricing, as I understand it, relies on at some point the fraud being understood. And I'm trying... Otherwise, you can't come in and say, well, it was these manual overlays that were causing the inflated prices. Or excuse me, it was the lack of understanding of the manual overlays that were increasing the prices. But then the manual overlays are not disclosed. And then you say, but that shows that that was causing the harm. Well, no, I think that market... We point to market evidence at each disclosure. You have the disclosure. I mean, the disclosure has to be tied. I don't know if I'm talking about a mismatch issue or what, but the disclosure has to be tied to what you're saying is wrong. And you're saying, well, they disclosed that they weren't able to get workers to come in and do the renovations. What does that have to do with the pricing model? Well, no, they disclosed that they had over-acquired and that's consistent. What does that have to do with the pricing model? In response to that, analysts immediately after that were skeptical of their suggestions. But why isn't that... And maybe this just goes to the evidence and how you value... It seems to me that you could explain the price decrease just as much from, hey, we overbought, as much as, oh, it turns out that we screwed up our pricing model. We weren't doing it like everybody assumed we were doing it. Well, ultimately, that was revealed at the very end, after the November 2nd. Go with me to that because now I'm... There was a Bloomberg report and Wall Street Journal report that identified Project Ketchup. But by that time, the market, they'd already ruled that the business was zeroed out. But that only goes to Zillow may have leaned into home acquisitions at the right time, at the wrong time. I don't understand where the pricing model... Well, the October 31 disclosures called it overpayment disclosures. That's what you're referencing. Well, again, we have... It's typical of securities fraud where the truth ebbs out over partial disclosures. We do reference the... That's why I don't care if it comes out over multiple disclosures. I want to know that it came out. And I'm not hearing from you where the pricing model is ultimately disclosed and caused the decline. Your Honor, we point to analyst market reactions in which they were initially skeptical and posited potential algorithmic errors after the October 17th through 18th. After the October... Paragraph 234, I think this is of your complaint. The pricing algorithms observed error rate has been far more volatile than expected. That's what Zillow acknowledged in November. I had also point to the expert reports that 2ER215, where at least three analysts publicly posited potential algorithmic errors after the October 31st and November 1st overpayment disclosures. Analysts' reaction recognized that Zillow might exit the eye buying due to undisciplined execution, the need for a rational bidding algorithm. In November 2nd, drawing it back, you have two types of disclosures. One is you have what the court identified as an announcement of the ultimate consequences of the fraud that was revealed. You have the winding down of the business and a $569 million... That's the problem I have with the argument you just said. You just called it the fraud that was revealed. I'm trying to understand the fraud. You're making a statement and I'm asking you for facts because it's not clear to me that it was a fraud that was revealed. I want to know. I mean, I think you're there, but you keep kind of obfuscating the issue. The fraud that was revealed was the pricing algorithm, correct or not correct? Well, no. What came from the company was the pricing algorithmic that they could not accurately predict what they had said just months ago that they had improved and that they could. I thought the theory was they said it worked and then they said it didn't work. That's right. That's right. Isn't that what the case is? Yes. And then it didn't... It's simpler than you're trying to make it. I think you might be confusing. I thought I had a handle on this and I think you might be confusing me more than you are intending to. And that's probably on me. They said we have a great algorithm. It's perfect. We love it. It's even better than it used to be. It tells us the exact price we should pay and everything's hunky dory. And then they say, oops, it really didn't predict things. We're going to turn it off. Yeah. Yeah. Okay. Yes. And then just going to opposing counsel, the court did not apply a loss causation standard. The court applied what Goldman Sachs said it should do. The court said it would take into account all evidence, even if that evidence crosses over with merits issues. And the issue of price impact, that issue, while it's separate elements, goes to related questions. Did the statement matter? And so you were going to, when the Goldman Sachs sent that down to district courts, it would naturally infer that the court would use tools that have been around. Let me ask you quickly, what is our standard of review? If we were to determine that the court, for example, used untoward wording in describing what it was doing, but we see hypothetically a match between the alleged misstatements and the correction, what do we do? I would say it's an abuse of discretion. So we look at the conclusion that certification is appropriate. Well, yeah. And even if we get there a slightly different way, in your view, we're looking at the end result. That's right. But to the point of the loss causation, that's not what the court did. What the court did is what is nationally what other courts are doing and what the Third Circuit recently did in J&J. It looks to three different points. Was the back end statement corrective? And it analyzed all evidence, found it was corrective of the alleged misstatements for each misstatement. They asked whether it was new information. The court went methodically through each corrective disclosure and determined it was new, consistent with the J&J court. It found that information that might be out there that's fragmented, like the analyst reports or other media reports, that didn't provide information with the requisite intensity and credibility, that can be a corrective disclosure. It considered Zillow's arguments and rejected them. And then it found that the information was value relevant. You know, was there a statistically significant stock drop? It was. And then you have analysts connecting that specific drop with the information that was released on the corrective disclosure. So that's precisely what Goldman instructs to do. All right. Thank you very much, counsel. A few points in rebuttal. First, the gross price overlays didn't come out until November 9th and November 17th after the class period. Stock price didn't move. Not a single October 8th, 17th. There was a 23% decrease on November 2nd. But not because they said overlays or that Zillow was refusing jobs. That's the date we shuttered the business. I thought Zillow said, I mean, this is, I thought Zillow acknowledged that it had been unable to accurately forecast future home prices and its pricing algorithms observed error rate has been far more volatile than expected. Right. That was on November 2nd. Why isn't that enough? Two problems, mismatch and not new. So, and I'll mismatch really briefly. The reason why it's the, I understand that the court is suggesting that it's, we said pricing was good and pricing was bad. That's really not their theory. Not even the court says that. The court in its class third order says what Zillow didn't do was it did not credit Zillow offers increased acquisition volume to the use of overlays. That's what the court said. The court didn't say, you promised you cracked the code for pricing. In fact, we said the opposite on August 5th, the CEO said, we got to get better and better pricing. It's really, really hard. So it's just not consistent with their theory. Number one, but there's a bigger problem with that. Let's assume that the court accepts that it's, we cracked the code for pricing and we got pricing wrong. Getting pricing wrong can't possibly be what had price impact here because it's already out in the market. They're relying on the efficient market hypothesis, right? Which is any publicly available information is already bound up on the price of the stock. Again, October 4th, RBC says we're getting pricing wrong. Looking at publicly available information. October 19th, a public news article. Zillow's paying well above the market median. October 20th, a BTIG analyst report. The average listing price is below the price. October 25th, listings are currently priced at a medium of 6.2% below what they were bought for. What dropped the price by 23% on November? They shut the business down. Your Honor, let's say there was no fraud here. Let's say there's no allegations of fraud. Let's say there's no allegations of fraud, right? And Zillow got pricing totally right. And then at the end, and they were doing great. And then they said, you know, we're shutting the business down. Price would have dropped. November 2nd, I thought that came later. No. November 2nd is when they shut the business down. That's why it dropped. And why it dropped on October 18th is they said they paused home buying. So it was only after the business was shut down that they revealed? That the Wall Street Journal article interviewed some people. I mean, look at, again, October 26th, Bloomberg article, couldn't have been more explicit. If you accept, and again, they're running away from the theory that got passed the motion to dismiss it stage. They are, but if you, if you accept it for purposes of this argument, October 26th Zillow quote, tweak the algorithms that power its home flipping operation to make higher offers. And that quote, slowing price appreciation means it will sell many homes at a loss. Quote, Zillow cut prices on nearly half of its us listings in the third quarter, according to Yipit signaling that its was commanding prices lower than it expected. Same exact quote on October 27th in Bloomberg, bank of America on October 28th. And why bank of America on October 28th is important is that the key bank report that they lay so much weight on, on October 31st repeats the exact same information that bank of America had put out three days earlier. If, and on all of these dates, I just took you through stock price didn't move at all. You want to know why? Everybody knew pricing was hard. The October 4th analyst says, everybody understands pricing is hard. If the stock price doesn't move on all of these disclosure dates that discloses the information that they claim caused the stock price to drop on the back end, the repeating of information that's already bound up in the stock price that doesn't cause it to move, can't suddenly cause it to move on the back end if we're on an efficient market. Um, and with that, and the last, last point on this day on the standard review, your honor, it's de novo, uh, because the court below relies on loss causation cases. That is error. And if, if you do anything, please, please, I hope that you'll, you'll correct that. Thank you. Thank you very much. Thank you both for your briefing and argument. In this case, this matter is submitted and we will see you tomorrow. Do you want to go ahead? Of course the dissection
judges: GRABER, OWENS, NELSON